1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT
7               FOR THE DISTRICT OF ARIZONA
8

9   Zep, Inc.,                          )   No. CV09-505-PHX-NVW
                                         )
10          Plaintiff,                   )   **FINDINGS OF FACT,**
                                         )   **CONCLUSIONS OF LAW,**
11   vs.                                 )   **and**
                                         )   **ORDER**
12                                       )
     Brody Chemical Company, Inc. and)
13   individuals Mark Bartley, Neil Carse,)
     Wayne Cassidy, Richard Crouse, and)
14   Anthony Strukel,                    )
                                         )
15          Defendants.                  )
                                         )
16   _____)

17          Before the Court is Plaintiff Zep, Inc.'s ("Zep") motion for preliminary injunction.

18   (Doc. # 1.)  A hearing on the preliminary injunction was held on April 14 and 15, 2009.

19   This order states findings of fact and conclusions of law in accordance with Fed. R. Civ.

20   P. 52(a)

21   **I. Findings of Fact**

22          Zep is a publicly traded company that sells industrial cleaning products.

23   Defendant Brody Chemical Company, Inc. ("Brody") is a direct competitor of Zep.  It

24   employs over 20,000 people in various locations.  The individual Defendants in this case

25   (collectively "the Sales Representatives") were originally employed as Zep outside sales

26   representatives.  Beginning in early 2008 and continuing through early 2009, each of the

27   Sales Representatives began working for Brody.  Brody paid referral bonuses to

28

1    Defendants Bartley, Strukel, and Carse for helping to bring Zep sales representatives to
2    Brody.
3              Each Sales Representative admits to having started to work for Brody and to
4    having sold Brody product to Zep customers before his employment at Zep was
5    terminated.   During the time that they worked for both Brody and Zep, the Sales
6    Representatives accessed confidential information maintained by Zep, such as customer
7    names, addresses, contact information, sales histories, and pricing information.  They
8    used such confidential information to help them sell Brody products to Zep customers.
9    After ceasing employment with Zep, the Sales Representatives retained documents
10   containing such confidential information on their personal computers.  Defendants
11   Cassidy, Crouse, and Carse admitted to downloading customer lists and information from
12   Zep's databases onto their personal computers shortly before ceasing employment with
13   Zep.  Defendant Cassidy, in particular, downloaded several hundred pages of detailed
14   customer information and purchasing history from Zep's databases the day after entering
15   into an employment relationship with Brody.  Defendants Cassidy and Carse sent the
16   customer information they obtained from Zep to Brody employees.
17             Zep derives substantial value from keeping the pricing of its products and the
18   identity, contact information, purchasing history, and payment history of its customers
19   secret.  Access to such information would allow a competitor to identify Zep's customers,
20   their needs, the timing of their purchases, the reliability of their payments, and the pricing
21   that would undercut Zep.  A competitor would have to invest substantial amounts of time
22   and resources to compile such information from publicly available sources, such as by
23   visiting each of Zep's customers.
24             Zep makes reasonable efforts to maintain the secrecy of its information.  It stores
25   such information on password protected computer systems inside its own secured
26   facilities.  Each of its sales representatives has a unique user name and password to access
27   Zep's databases.  A Zep sales representative can only access information regarding his or
28                                            - 2 -

her own customers and only while employed at Zep.  Zep's pricing information is encrypted.

Zep also requires its sales representatives to sign contracts containing covenants not to disclose Zep's confidential information or solicit Zep's customers or employees for certain periods of time after leaving Zep.  Two forms of such contracts are at issue in this case.  Defendants Strukel and Cassidy signed an older version of the contract, which contained the following covenant regarding non-solicitation of customers:

> Sales Representative hereby expressly covenants and agrees that during the term of employment hereunder and for a period of eighteen (18) months following the termination of employment hereunder, whether such termination is voluntary or involuntary, Sales Representative will not, for or on behalf of Sales Representative or any person, persons, partnership, or corporation (except Company), directly or indirectly, within the Territory [defined as Maricopa County, Arizona] sell or attempt to sell or solicit the sale of any products of the same or similar kind as those offered or sold by Company at any time during the twelve (12) month period immediately preceding the termination of Sales Representative's employment hereunder, to any person, persons, partnerships, or corporation who was solicited for the sale of or sold any such products by Sales representative at any time during Sales Representative's employment hereunder.

It also contained the following covenant regarding non-solicitation of employees:

> Sales Representative hereby expressly covenants and agrees that during the term of employment hereunder and for a period of eighteen (18) months following the termination of employment hereunder, whether such termination is voluntary or involuntary, Sales Representative will not, for or on behalf of Sales Representative or any person, persons, partnership, or corporation (except Company), directly or indirectly, induce, persuade, or encourage or attempt to induce, persuade, or encourage any person who was employed by the Company at any time during the term of Sales Representative's employment hereunder, to terminate such employee's position with the Company and become employed by any person, persons, partnership, or corporation which is engaged in the offer or sale of products of the same or similar kind as those offered or sold by Company at any time during the twelve (12) month period immediately preceding termination of Sales Representative's employment hereunder.

It also contained the following covenant regarding non-disclosure of confidential information:

> Sales Representative hereby agrees that during the term of Sales Representative's employment with Company and for a period of eighteen (18) months following termination of Sales Representative's employment with Company, whether such termination is voluntary or involuntary, Sales

1
2
3
4
5

Representative will not, for or on behalf of Sales Representative or any person, persons, partnership, or corporation (except Company), directly or indirectly, use for Sales Representative's own benefit or disclose to any other party any confidential information of Company disclosed or made known to Sales representative at any time during Sales Representative employment with Company. "Confidential Information" as used herein means any data or information, other than trade secrets, that is material to Company and not generally known by the public, including, without limitation, customer lists, pricing policies, prices, product development plans, and market strategies.

6  Defendants Carse and Crouse signed a newer version of the contract that contained the

7  following covenant regarding non-solicitation of customers:

8
9
10
11
12
13

Non-Solicitation Covenant.  Employee covenants and agrees that during the term of Employee's employment with employer and for a period of twelve (12) months following the termination of such employment, whether voluntary or involuntary, Employee shall not for or on behalf of Employee or any such person or entity (except Employer), directly or indirectly, solicit, contact, or communicate with or attempt to solicit, contact or communicate with any customer or potential customer of Employer that Employee solicited, contacted, communicated with, sold or received commissions or other compensation with respect to at any time during the six (6) month period immediately preceding the termination of Employee's employment with Employer, for the purpose of or with the view to selling or providing any products, services or equipment or items competitive with the Product Line.

14
15  It also contained the following covenant regarding non-solicitation of employees:

16
17
18
19

Non-Inducement Covenant.  Employee covenants and agrees that during the term of Employee's employment with Employer and for a period of twelve (12) months following termination of such employment, whether voluntary or involuntary, Employee shall not, for or on behalf of Employee or any person or entity, directly or indirectly, induce, persuade or encourage or attempt to induce persuade or encourage any person who was employed by Employer during the twelve (12) month period immediately preceding Employee's termination, to terminate such employee's position with Employer.

20  It also contained the following covenant regarding non-disclosure of confidential

21  information:

22
23
24
25
26
27

Non-Disclosure Covenant.  Employee covenants and agrees that during the term of Employee's employment with Employer and following the termination of such employment, whether voluntary or involuntary, Employee shall not, for or on behalf of Employee or any such person or entity (except Employer), directly or indirectly, use for the Employee's own benefit or disclose to any other party any Trade Secrets or Confidential Information (as defined below) of Employer.  "Trade Secrets" means information without regard to form, relating to Employer's business which is not commonly known by or available to the public and which derives economic value, actual or potential, from not being generally known to other persons and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality,

28

including, but not limited to, technical or nontechnical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings processes, financial data, financial plans, product plans, or lists or actual or potential customers or suppliers.   "Confidential Information" means information of Employer that is non-public, proprietary and confidential in nature but is not a Trade Secret.  The foregoing confidentiality obligations shall commence as of the date hereof and shall continue (A) with respect to all Trade Secrets, at all times thereafter so long as such Trade Secrets constitutes trade secrets under applicable law, and (B) with respect to all Confidential Information, for a period of eighteen (18) months following termination of Employee's employment with Employer.

Zep has not produced any evidence that Defendant Bartley signed a contract containing either version of the restrictive covenants.

New Zep sales representatives are expected to develop their own customer base through their own efforts.  Zep has a training program for new sales representatives that can last up to twenty-four months.  A new sales representative is given a salary while participating in the training program.  New sales representatives that perform well can transition to a largely commission-based pay structure in much less than twenty-four months.  Defendant Carse, for example, was placed on full commission after only three weeks with Zep.

No Zep sales representative is permitted to sell to an "active customer" of another sales representative.  An active customer is one who the sales representative has sold to in the last six months.  An "inactive customer" is one to whom the assigned sales representative has not made a sale in the last six months.  Any Zep sales representative can receive a commission for selling to an inactive customer.

When a Zep sales representative leaves the company, that representative's accounts are reassigned to existing Zep sales representatives.  When possible, an account will be assigned to a sales representative with specific knowledge and experience selling to other customers in the same industry segment.  Otherwise, the account will be assigned to a sales representative that has demonstrated growth potential or to a newer sales representative to speed his or her transition off of the training program.

1    On February 11, 2009, Zep sent letters to Brody and to the Sales Representatives
2    demanding that they cease and desist violating the restrictive covenants in their
3    employment contracts.   The Sales Representatives have not disavowed any intention to
4    continue soliciting customers that they had previously serviced for Zep.  Brody has not
5    indicated that it will instruct the Sales Representatives to abide by the terms of the
6    covenants.  Zep has been unable to recapture a substantial number of the customers it lost
7    when the Sales Representatives departed for Brody.

8    **II.  Conclusions of Law**

9    To obtain preliminary injunctive relief, a plaintiff must demonstrate "that he is
10   likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence
11   of preliminary relief, that the balance of equities tips in his favor, and that an injunction is
12   in the public interest." *Winter v. NRDC*, 129 S. Ct. 365, 374 (2008).  "[T]he less certain
13   the district court is of the likelihood of success on the merits, the more plaintiffs must
14   convince the district court that the public interest and balance of hardships tip in their
15   favor." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir.
16   2003) (en banc) (per curiam).

17   **A.  Likelihood of Success on the Merits**

18   **1.  The Restrictive Covenants**

19   It is likely that the covenants regarding non-solicitation of Zep customers and
20   employees are unenforceable.  "A restrictive covenant — whether a covenant not to
21   compete or an anti-piracy agreement — is enforceable as long as it is no broader than
22   necessary to protect the employer's legitimate business interest." *Hilb, Rogal &*
23   *Hamilton Co. v. McKinney*, 190 Ariz. 213, 219, 946 P.2d 464, 467 (Ct. App. 1997).  With
24   respect to sales representatives, the "employer's protectable interest [is limited] to those
25   customers to whom the employee represented the employer's goodwill." *Amex Distrib.*
26   *Co. v. Mascari*, 150 Ariz. 510, 518, 724 P.2d 596, 604 (Ct. App. 1986).  "When the
27   restraint is for the purpose of protecting customer relationships, its duration is reasonable

28

1    only if it is no longer than necessary for the employer to put a new man on the job and for

2    the new employee to have a reasonable opportunity to demonstrate his effectiveness to

3    the customers." *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 370, 982 P.2d 1277,

4    1284 (1999) (quoting *Amex Distrib. Co.*, 150 Ariz. at 518, 724 P.2d at 604).

5         Both versions of the non-solicitation covenants at issue purport to restrict the Sales

6    Representatives from soliciting prospective customers in whom Zep has no legitimate

7    business interest.  The older agreement would restrict them from soliciting anyone who

8    they had ever solicited on behalf of Zep at any time during their employment with Zep.

9    So, for example, if one of the Sales Representative had unsuccessfully solicited a given

10   prospect a single time twenty years ago, he would be forbidden to solicit that prospect on

11   behalf of Brody.  The newer contract limits the scope of the restriction to those prospects

12   that the representative "solicited, contacted, communicated with, sold or received

13   commissions or other compensation with respect to at any time during the six (6) month

14   period immediately preceding the termination of Employee's employment with

15   Employer."  According to this provision, if a Sales Representative simply left his business

16   card at a prospect's office once in the past six months but never contacted that customer

17   again and never sold a Zep product, he would be forbidden to solicit that prospect on

18   behalf of Brody.  Zep does have some legitimate interest in protecting prospective

19   customers that its sales representatives have worked to develop, even if no sale has yet

20   been made.  However, that interest does not extend to the passing, unsuccessful encounter

21   included within the scope of its covenant.

22        Furthermore, the duration of Zep's restrictions is longer than necessary for it to put

23   a different sales representative on the job and have that representative demonstrate his or

24   her effectiveness to the customer.  The restriction in the older contract lasts for eighteen

25   months.  The restriction in the newer contract lasts for twelve months.  Zep justifies this

26   duration as the amount of time it takes them to train a new sales representative to take

27   over the accounts.  However, Zep admits that it often reassigns the accounts of a departed

28

representative to existing representatives with experience in the given industry segment. It also frequently reassigns accounts to existing representatives that have demonstrated growth potential. Therefore, the restrictive covenant does not necessarily need to last long enough to train a brand new sales representative to take over the accounts. Even when Zep does have to train a new employee, skilled sales people can transition to commission-based pay with as little as three weeks of training. The evidence also shows that most of Zep's customers order cleaning products more frequently than once a year. Consequently, a sales representative that has been transferred an existing account will likely have multiple opportunities to demonstrate his or her effectiveness to the customer in far less than a year's time.

Considering these problems altogether, Zep's customer non-solicitation covenants are broader than necessary to protect its legitimate business interests. Similarly, its employee non-solicitation covenants are likely overbroad. They purport to prevent departing sales representatives from soliciting any of Zep's employees for at least a year, no matter the extent of the sales representative's relationship, if any, with that employee. To save Zep's covenants would require more than "eliminating grammatically severable, unreasonable provisions." *Farber*, 194 Ariz. at 372, 982 P.2d at 1286. It would require supplying new terms for the duration of the restrictions and qualifications to their scope, inappropriately "rewrit[ing] and creat[ing] a restrictive covenant significantly different from that created by the parties." *Id.* It is therefore likely that the restrictive covenants in Zep's agreements regarding non-solicitation of customers and employees are unenforceable.

### 2. Trade Secrets

Under Arizona law, a trade secret is information, including a compilation, that both:

     (a)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(b)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S. § 44-401(4).  "A list of customers, if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money, constitutes an important part of a business and is in the nature of a trade secret." *Prudential Ins. Co. v. Pochiro*, 153 Ariz. 368, 371, 736 P.2d 1180, 1183 (Ct. App. 1987) (quoting *Town & Country House & Homes Service, Inc. v. Evans*, 150 Conn. 314, 319, 189 A.2d 390, 393–394 (1963)).  A person who acquires knowledge of a trade secret "under circumstances giving rise to a duty to maintain its secrecy or limit its use" and who proceeds to use or disclose that trade secret without express or implied consent of the owner has misappropriated the trade secret.  A.R.S. § 44-401(2)(b)(ii).  Likewise, acquisition of a trade secret by a person who knows or has reason to know that it is being revealed in breach of a duty to maintain secrecy has misappropriated the trade secret. § 44-401(1)–(2)(a).  A court may enjoin actual or threatened misappropriation and may continue the injunction for a "reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." § 44-402(A); *see also Pochiro*, 153 Ariz. at 370–72, 736 P.2d at 1182–84 (upholding an injunction prohibiting an insurance salesman from soliciting any business from policyholders whose information he improperly obtained from his former employer's records).

As stated in the Court's findings of fact, Zep derives economic value from keeping secret its pricing and customer information, including names, addresses, contact details, purchasing, and payment history.  Such information is not readily available to Zep's competitors and Zep makes reasonable efforts to maintain its secrecy.  Therefore, Zep's pricing and customer information is likely a trade secret.

There is little doubt that each of the Sales Representatives misappropriated Zep's pricing and customer information.  The Sales Representatives had a duty not to use Zep's trade secrets for their own benefit and to their employer's detriment.  "The law will

- 9 -

1  import into every contract of employment a prohibition against the use of a trade secret by

2  the employee for his own benefit, to the detriment of his employer, if the secret was

3  acquired by the employee in the course of his employment." *Pochiro*, 153 Ariz. at 371,

4  736 P.2d at 1183 (quoting *Evans*, 150 Conn. at 319, 189 A.2d at 393–394).  Each of them

5  surreptitiously began working for Brody while remaining employed at Zep.  During the

6  time that they were employed by both Zep and Brody, they accessed and used Zep's

7  pricing and customer information to facilitate sales of Brody product.  Such use of Zep's

8  pricing and customer information constituted misappropriation of its trade secrets.

9       Furthermore, several of the Sales Representatives have admitted deliberately

10  downloading pricing and customer information from Zep's databases immediately prior

11  to leaving Zep and retaining that information while working for Brody.  Defendant

12  Cassidy downloaded several hundred pages of detailed pricing and customer information

13  and sent that information to Brody employees.  By the very nature of that information,

14  Brody had reason to know that it was being revealed in breach of a duty to maintain its

15  secrecy.  Brody has not stated that it refused to accept such information.  Brody has

16  therefore misappropriated Zep's trade secrets and it is likely that Zep will prevail on the

17  merits.  An injunction to eliminate the commercial advantage obtained by Defendants'

18  misappropriation of trade secrets is appropriate.

19       The Sales Representatives are not liable for merely failing to return or to destroy

20  Zep information that they received from Zep in the ordinary course of business and which

21  Zep did not explicitly ask them to return or destroy.

22  **B.  Irreparable Harm and Balance of Hardships**

23       Zep is likely to suffer irreparable harm in the absence of preliminary injunctive

24  relief.  It has lost customers as a result of Defendant's misappropriation of its trade

25  secrets.  The longer that Brody and the Sales Representatives are able to service those

26  customers, the less likely it is that Zep will ever regain them.  An injunction will impose

27  substantial hardship upon the Sales Representatives, who testified that their already

28

1   modest earnings have substantially declined since leaving Zep.  However, their liability is
2   clear, and if the Court were to allow them to continue to sell to customers they obtained
3   or retained with the assistance of improper means, Zep would continue to suffer
4   substantial harm that is difficult and costly to quantify.  The hardship to the Sales
5   Representatives stems from their own wrongful actions, so the balance of hardships tips
6   decidedly in Zep's favor and preliminary injunctive relief is appropriate.

7       **C. Injunction**

8       The Court will order Brody to destroy or return all of Zep's customer information,
9   including customer names, address, contact information, pricing, purchasing, and
10  payment history, including any derivations thereof, that it obtained from the Sales
11  Representatives.

12      Furthermore, the Court will enjoin soliciting or selling to certain customers as
13  follows.  The evidence shows that six months is the period of time required for a sales
14  relationship in this industry to go cold.  For example, Zep deems a customer who has not
15  purchased any product for six months "inactive," opening that customer up to competition
16  from other sales representatives.  Furthermore, in its newer contracts, Zep limited its non-
17  solicitation covenant to those customers with whom a sales representative had done
18  business in the past six months.  Therefore, in its discretion, the Court will place the
19  following limits on the customers included within the scope of the injunction (the
20  "Restricted Customers").

21      To be a Restricted Customer, during the six month period immediately preceding
22  the establishment of a given Sales Representative's employment relationship with Brody,
23  the customer 1) must have purchased $150 or more of Zep product from that Sales
24  Representative and 2) must not have purchased Brody product from any Brody sales
25  representative.  A Sales Representative will be enjoined from soliciting or selling to any
26  Restricted Customer for six months if that Sales Representative has solicited or sold to
27  that customer on behalf of Brody since establishing an employment relationship with

28

1  Brody.  All other Brody sales representatives will be enjoined from soliciting or selling to

2  any Restricted Customer for three months.

3        IT IS THEREFORE ORDERED that Plaintiff Zep, Inc.'s motion for preliminary

4  injunction (doc. # 1) is granted.  Plaintiff shall lodge a proposed form of preliminary

5  injunction, including a list of Restricted Customers, after conferring with the Defendants

6  to determine if a form of order can be agreed upon, but in any event no later than April

7  27, 2009.  If the parties cannot agree on the list, further evidentiary proceedings will be

8  held expeditiously to resolve it.  A preliminary injunction bond in the amount of

9  $100,000.00 must be posted before a preliminary injunction will issue.

10        Dated: April 20, 2009.

11  _____

12                    Neil V. Wake
             United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28